UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM GIORDANI,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) | Docket No. 23-cr-10157-AK |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through undersigned counsel, hereby submits this memorandum to assist the Court in sentencing the defendant, William Giordani. As outlined below, the government recommends that the defendant be sentenced to a period of three years' probation. Included in the special terms of probation should be the following: participation in drug treatment; participation in a mental health evaluation and treatment; a prohibition from the Harvard campus and related facilities; and participation in a restorative justice program. The government also recommends a $2,000 fine and a $100 special assessment.

## I. The Charge and Related Facts

The defendant has pleaded guilty to misprison of a felony in violation of 18 U.S.C. § 4. [D.19]. The defendant participated in, and then failed to report, a series of extortionate bomb threats targeting Harvard University in April 2023, in violation of 18 U.S.C. §§ 875(b) (extortionate interstate threats to injure a person) and 1038(a)(1)(A) (intentional conveyance of false information regarding the planned detonation of a bomb). *Id.* Notably, the defendant took steps to conceal his involvement in the bomb threat and extortion by deleting text messages, directing others not to reveal his involvement, and actively avoiding law enforcement so that he

would not have to surrender evidence on his telephone and testify. PSR ¶¶ 23-25.

At the time the defendant placed the hoax bomb device in the Harvard Science Center Plaza, it is reasonable to conclude that he did not know the entire scope of the extortion plot. The individuals primarily responsible for the plot successfully duped the defendant into placing the device in the plaza through the use of a ruse: they hired the defendant to deliver specified items to a Harvard student and then directed the defendant to leave the device in the plaza for the student to retrieve. PSR ¶¶ 8-14, 20. While this ruse was used to draw the defendant into the plot, the defendant's involvement was not entirely unwitting. Among other things, two days before he planted the device, the defendant shared with his associates that he thought what he was delivering "sounds possibly like a bomb." PSR ¶¶ 11,13. As discussed below, the defendant set aside his concern that the package might be a bomb, and any concomitant risk to those in the Harvard Science Center Plaza that day, because he was desperate to make a few hundred dollars. Nonetheless, within an hour or two of planting the device, he knew that he had played a central role in an extortionate bomb plot. PSR ¶¶ 21-23. At that point, instead of alerting authorities, he continued to press for payment from the perpetrators, including trying to extort them. PSR ¶ 22. The defendant's concern was not for the safety and wellbeing of those he had helped victimize. Instead, he remained focused on getting paid for his effort, and not getting caught by law enforcement. PSR ¶¶ 23-25.

The placement of the hoax device in the Science Center Plaza and the resulting police response caused significant concern and anxiety in the students, faculty, and staff of Harvard University. *See*, https://www.thecrimson.com/article/2023/4/14/suspicious-package-science-center/; PSR¶¶ 18,19. A University-wide alert was sent to the Harvard community warning all

to stay away from the Science Center Plaza. *Id*. The plaza was cleared and cordoned-off, and buildings adjacent to the plaza were evacuated, including a library in the Science Center and classrooms in that building. *Id*. In another building, the main Freshmen dining hall was closed. *Id*. Classes were disrupted and at least one mid-term examination was cancelled. *Id*. Notably, when the device was rendered safe by the Cambridge Police Department Bomb Squad through the use of a precision watercannon, many students believed that a bomb had exploded in the plaza. *Id*. The Harvard Crimson reported one student saying,

> "I saw on Sidechat [a social media app used by Harvard students] that the bomb blew up. Apparently that's not true, or maybe it is true — I don't even know," [the student] said. "There was a lot of uncertainty around what was happening, which obviously, leads to anxiety."

*Id*.

These kinds of incidents not only cause temporary disruption of student life, but they can have a cumulative effect on levels of anxiety and depression among students. *See, e.g.* https://www.apa.org/monitor/2022/09/news-mass-shootings-collective-traumas (citing studies of students who suffer anxiety, depression, and other negative effects from hearing about mass shootings and related events, and engaging in mass shooting exercises); http://hutchcollegian.com/2024/03/08/school-threats-lead-to-anxiety-frustration-and-fear/ ("Confused, scared, worried, uneasy, nervous. Those are just a few words to describe how students felt on Feb. 12 when a shelter in place was issued after Hutchinson Community College had been notified of a bomb threat."); https://lohslakeviews.com/3008/features/how-school-shooting-fear-has-increased-student-anxiety/ ("According to NBC News, studies have shown that with the increased enforcement of mass shooting drills, anxiety rates have gone up 42 percent and depression rates have increased by 39 percent within school communities." ). The

fundamental purpose of extortionate bomb threats is to instill fear and cause panic. While such fear and panic are difficult to measure in the context of a criminal case, it is essential that they are not discounted or dismissed.

## II. **Sentencing Guideline Calculation**

The parties, as well as the PSR, are in agreement with regard to the Sentencing Guideline calculation. The defendant's offense level is 11. PSR ¶ 30. With acceptance of responsibility, the defendant's total offense level is 9. PSR ¶¶ 30-37. The defendant's criminal history category is III. PSR ¶ 66. The sentencing table calls for an incarcerative sentence of eight to fourteen months, but is in Zone B of the sentencing table. PSR ¶ 107. A portion of a Zone B sentence may be in the form of home detention, community confinement, and the like. PSR ¶ 112a. The defendant's guideline fine range is $2,000 to $20,000, and he has not submitted anything to the Probation Office to demonstrate that he cannot pay such a fine. PSR ¶¶ 105, 115.

Relatedly, by statute (18 U.S.C. § 3561(c)(1), if the defendant is sentenced to probation, it may not be less than one year or more than five years. PSR ¶ 111.

## III. **18 U.S.C. § 3553(a) Factors**

The government is recommending a probationary sentence in this case, rather than a period of incarceration, in large part because the defendant's criminal conduct was driven by a substance abuse addiction which spans more than three decades. This fact, coupled with the fact that the defendant has made substantial efforts to address this addiction while on pretrial release, persuades the government that public safety is best served by an extended period of probation and intensive drug treatment.

The defendant's mobile telephone revealed that prior to the offense the defendant was living day-to-day by responding to craigslist advertisements and related requests for short-term delivery, moving, or other manual labor jobs. Once he had cash in hand, it most often went to purchase cocaine or crack. His text messages suggested that on the date he left the hoax bomb at Harvard, he was indebted to a drug dealer and hoped to use the proceeds from this delivery job (which sounded like a bomb) to pay off that debt and get another fix. That drug dealer was one of the first people the defendant contacted after he was stiffed by the primary perpetrators. In short, there is a direct causal relationship between the defendant's drug addiction and his criminal conduct in this case. His addiction drove his need for cash and deprived him of reasonable judgement.

Similarly, the defendant's criminal history reflects a pattern consistent with individuals struggling with substance addiction, along with a strong element of distain for, and conflict with, law enforcement. PSR ¶¶ 40-79. For his entire adult life, the defendant has persistently engaged in low level crimes, most related to addiction and combativeness with police. *Id*. The short jail sentences he received for these crimes – whether a matter of a few days or several months – have had no impact on his criminal trajectory. *Id*. For 30 years he has cycled in and out of jails. *Id.* Even during his PSR interview, the defendant noted, "his drug use has never caused any problems in his life." PSR ¶ 94.

By contrast, according to the Probation Office, since being revoked on pretrial release in June 2023, the defendant has made a concerted effort to stay sober. As with all persons dependent on narcotics (or the hustle associated with narcotics), his recovery has been imperfect. PSR ¶¶ 98-99. Because this crime was one driven by addiction rather than malice, and the

defendant has demonstrated an ability to benefit from narcotics treatment, the Court should challenge the defendant to commit to a sober life, and to gain a fuller perspective on how narcotics have affected him. The government also suggests that the defendant's interest in obtaining mental health treatment is a positive sign, and should be encouraged. PSR ¶ 90.

The government recommends a period of three years' probation while the defendant will recommend the minimum term of probation, one year. [D.69]. Given the defendant's 30 year history of drug addiction and persistent criminal conduct, a single year of probation, even when added to his pretrial release period, is woefully inadequate. His addiction is deeply embedded and a fundamental element of his adult lifestyle. It is a near certainty that the defendant will struggle with sobriety going forward, and have some relapses. When he does so, he will need the Probation Office to assist in his recovery by locating providers and ensuring he complies with program rules and sober house placements. A short period of probation would be similar to the prior jail sentences the defendant has served – largely ineffective in accomplishing the necessary major life change. By contrast, a period of three years of probation is necessary to assist the defendant bend the arc of his life in a new direction. A substantial period of probation is essential to ensure that the defendant has both the resources and incentive to build and maintain a sober life.

In sum, the following sentence is sufficient, but not greater than necessary, to accomplish the purpose of sentencing in this case. The sentence reflects the nature and seriousness of the offense, is aimed primarily at deterring future criminal conduct of the defendant and advancing public safety, and will provide the defendant with the care necessary for him to make a substantial change in the trajectory of his life. As such, this recommendation comports with 18

U.S.C. § 3553(a). The government's recommendation is:

- 3 years of probation;
- A fine of $2000;
- A special assessment of $100;
- In addition to the standard terms of probation, the following special terms should be included:
    - Participate in drug treatment as recommended by Probation, including living in a sober home;
    - Participate in a mental health evaluation and treatment as recommended by Probation;
    - Participate in a restorative justice program; and
    - A requirement that he stay away from Harvard University and its related facilities for the duration of his probation.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: *s/John T. McNeil*
JOHN T. McNEIL
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

Suffolk, ss.: Boston, Massachusetts
April 17, 2024

I, John T. McNeil, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*s/John T. McNeil*
JOHN T. McNEIL